Alois Zydeck, Appellee, v. Chicago and Northwestern Railway Company, Appellant.

Gen. No. 43,841.

389

Opinion filed November 13, 1947. Rehearing denied December 12, 1947. Released for publication December 13, 1947. (Formerly an abstract 332 A. 657. Published in full by order of the court March 9, 1948.)

LOWELL HASTINGS, DRENNAN J. SLATER and JAMES B. O'SHAUGHNESSY, all of Chicago, for appellant.

KELNER & KELNER and LESTER E. WILLIAMS, all of Chicago, for appellee.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This action was brought by plaintiff, Alois Zydeck, to recover damages for injuries sustained by him as the result of the alleged negligence of the defendant, Chicago & Northwestern Railway Company, in starting one of its trains while he was boarding same. The case was tried before the court and a jury. A verdict was returned finding defendant guilty and assessing plaintiff's damages at $15,000. At defendant's request

a special interrogatory was submitted to the jury, which interrogatory and the jury's answer thereto are as follows: "Did plaintiff exercise ordinary care and caution for his own safety under the conditions shown by the evidence to have existed immediately prior to and at the time of the occurrence in question? Answer: Yes." Defendant filed motions for judgment notwithstanding the verdict, for a new trial and to set aside the answer to the special interrogatory. These motions were all denied and judgment was entered on the verdict. Defendant appeals from such judgment. It is not claimed that the damages awarded plaintiff are excessive.

Plaintiff's original complaint, which consisted of one count, was based on the Federal Employers' Liability Act. At the close of plaintiff's case defendant presented a motion for a directed verdict on the ground that there was no showing that plaintiff was working for defendant on the day the accident occurred and that consequently the Federal Employers' Liability Act was not applicable. The trial court agreed that said act was inapplicable and granted plaintiff leave to file three additional counts, each based on common-law negligence. At the close of all the evidence the trial court, on its own motion, instructed the jury that plaintiff had no right to recover under Count I of his complaint.

Count II alleged in substance that on July 12, 1945, defendant operated a train of cars in an easterly direction towards Chicago; that defendant invited plaintiff to become a passenger thereon at its depot at Proviso, Cook county, Illinois; and that while, in the exercise of ordinary care for his own safety, plaintiff was attempting to board the train but before he was fully and safely aboard, it was suddenly and negligently started and jerked forward, causing him to be thrown to the ground and under the wheels of the train and thereby injured.

Count III alleged in substance that defendant negligently permitted a portion of a timber in its station platform to become rotten and decomposed and to develop into a hole; and that while plaintiff, in the exercise of reasonable care for his own safety, was trying to board defendant's train, his foot fell into said hole, causing him to slip and fall under the train and to be thereby injured.

Count IV charged in substance that plaintiff presented himself for the purpose of being carried as a passenger on defendant's train; that while he was attempting to board the train, it was negligently started with a jerk and at approximately the same time his foot slipped into a hole negligently permitted to exist in a timber which was part of the station platform; and that by reason of defendant's negligence he was thrown to the ground and under the wheels of the train and thereby injured.

Defendant's answer denied the material allegations of the additional counts and asserted the affirmative defense that plaintiff used and traveled on a pass issued to him by defendant as a gratuity, that by the terms of the pass plaintiff assumed all risk of injury and that defendant therefore was not liable for any of the acts of negligence alleged in plaintiff's complaint.

Plaintiff filed a reply to defendant's answer in which he asserted that the relationship of employer and employee existed between him and defendant at the time of the accident and denied in effect that defendant was released from liability under the terms of the pass.

Zydeck received injuries on July 12, 1945, which necessitated the amputation of his right leg a short distance below the knee, when he attempted to board defendant's eastbound train for Chicago at its station at Proviso, Illinois. He was employed by defendant on February 22, 1944, and worked intermittently thereafter as a transient trucker in its Proviso freight

house. Transient employees were permitted by defendant to work when they saw fit to do so. They were paid their hourly wages daily and when they were paid same, they were given a pass for transportation to and from their place of employment. Several of such passes were found in plaintiff's pocket after the accident and four of them were introduced in evidence. One of the passes (substantially the same as the other three) was issued to plaintiff on July 2, 1945, and expired July 31, 1945. It was good for six round trip rides between Proviso and Chicago. On the reverse side of each pass appeared the following: "Conditions: This pass is not transferable. Its use for transportation constitutes an agreement that the user assumes all risk of injury to his person and of injury to or loss of his property, and that the carrier shall not be liable therefor in any circumstances. . . ." According to plaintiff, when he first went to work in defendant's freight house, the man, who received his application and employed him, told him that he was to receive seventy-five cents an hour and a pass. His testimony in this regard was undisputed. While transient freight handlers were paid their hourly wages daily at the close of each day's work, twice a month they were paid accumulated amounts based on the tonnage they had handled during the preceding one-half month period. According to defendant's chief clerk, who had personal charge of delivering to transient workers their tonnage pay checks, it was permissible for such workers "who were absent from work on a day [to] come out and get their [tonnage] pay." Plaintiff worked on July 10. He did not work on July 11 or 12, 1945, but he was still in defendant's employ in the sense that his job was open for him, whenever he cared to return to work. He spent the morning of July 12, 1945, moving from his room in the Roosevelt Hotel at Milwaukee avenue and Halsted street to his sister's home at 725 May street, Chicago.

Desiring to secure his tonnage pay check, amounting to $8.79, Zydeck went to Proviso that afternoon on one of defendant's passenger trains, using a pass which had been previously issued to him. He proceeded to the freight house, where he received his check. He then went to the restaurant in the basement of the freight house, where he had a cup of coffee and a sweet roll. According to plaintiff, he intended to take defendant's 3:13 p. m. train back to Chicago. He left the restaurant about 2:55 p. m. to go to the Proviso depot, to reach which it was necessary to travel a distance of about three blocks southeast across a prairie on a beaten path. It required about eight minutes to walk from the freight house to the depot.

Defendant has two main line tracks at Proviso, which run in an east and west direction. The eastbound track is to the north and the westbound track to the south. The south side of the station platform involved in the accident is about three feet north of the north rail of the eastbound track. This platform is approximately 400 feet long and is constructed of fine crushed stone. Along the south side of the platform there are retaining timbers 8 inches wide and 12 or 15 inches high, which timbers are laid lengthwise and form part of the platform. Near the middle of the platform there are the bodies of two old passenger coaches, which serve as waiting rooms. These coaches are each approximately 52 feet long and are set back about 9 feet from the south edge of the platform. The station coaches are in line with each other and there is an opening of approximately 5 feet between them.

There were two routes available for employes to travel from the freight house to the Proviso depot. One was on a path part way across a prairie and then by way of an overhead bridge or viaduct, from which there were stairs leading down to the station platform. The bottom of these stairs was about 80 feet west of

the west end of the most westerly depot coach. The other and shorter route was along the beaten path which plaintiff took and this path led to the opening between the two depot coaches.

The train involved in the accident was eastbound and consisted of an engine and five passenger cars, the first car being about 80 feet long and the second about 68 feet long. The train was due at the Proviso station at 3:13 p. m. and it was on time. Since the train carried relatively few passengers at that time of day, only the first two cars were in use and the vestibules and trapdoors on the north side of those cars were left open. It was dry and clear on the day of the accident. By agreement plaintiff was permitted to testify in Polish through an interpreter.

Zydeck testified in substance that he was 51 years old; that he entered upon the station platform through the opening between the two depot coaches; that when he reached the platform, the train in question was approaching from the west; that while he was crossing the prairie, one man was crossing south on the overhead bridge toward the station; that he saw that man get on the train, while it was standing still; that "he was ahead of me and I followed him . . . when he was getting on this train I was right close to him . . . I was about two feet away from him"; that when that man was getting on the train ahead of him, he (plaintiff) saw the engineer face towards him; that he (plaintiff) was attempting to board the train at the rear entrance of the second car; that when he took hold of the handrail with his right hand the train was standing still; that "when I got hold of the handle bar I put my right leg on the step . . . at that time my left leg went into the hole and I fell . . . that is the time the train started"; that he fell toward the east and then under the train; and that he did not "remember anything further."

Zydeck testified on cross-examination that when he came through the opening between the two depot coaches, the train was standing still and that at that time the rear steps of the second car were about three feet west of the hole his left foot went into; that it was "three steps" from the south end of the opening between the two depot coaches to the point where he took hold of the grab iron at the rear entrance of the second car; that he did not notice the hole before he took hold of the grab iron; that the train started with a violent jerk and threw him off balance; that he first saw the hole after the train jerked and his foot went into it; that it was "the tip of his foot that fell into that hole"; and that after he stepped into the hole, he was thrown under the train.

No witness other than plaintiff testified in his behalf as to how the accident occurred.

The photograph, upon which plaintiff identified the hole his left foot went into, was taken two days after the accident. The record discloses that this hole was in the top and at the east end of one of the platform retaining timbers; that it was opposite the opening between the two depot coaches; that it had a surface area of about sixteen square inches and was about two inches deep; that the timber was rotten for at least three and one-half additional inches below the bottom of the hole; and that the hole had existed for at least two and one-half years before the accident.

James E. White testified in substance that he was the engineer of the train involved in the accident; that he was on the north side of the engine which was on the front end of the train but "headed west"; that when he stopped the train at the Proviso station, the front end of the first car was approximately a few feet east of the east depot coach; that the opening between the first two cars of the train was about even with the opening between the two depot coaches and

that the rear end of the second car of the train was about 30 or 40 feet west of the opening between the two depot coaches; that while the train was stopped at the Proviso station, he was facing west; that all the passengers who were on the platform boarded the train; that he then saw a man running toward the station on the overhead bridge and waited for him; that that man boarded the train by way of the rear steps of the second car; that there was a baggage compartment in the front portion of the first car; that the conductor, who was standing in the open door on the north side of the baggage compartment, gave him the signal and he started the train; that at the time he started the train there was no one on the eastbound station platform; that he started the train with an even motion; that, after it had moved about a car length or little more, he saw plaintiff "run through the passageway beween the two depot cars and lunged for the train with one hand and one foot and that when he raised the other foot he tripped and went under and lost his balance"; that he "immediately applied emergency and stopped"; that the train was traveling about five miles an hour at the time of the accident; that it moved about two car lengths from the time it started until it was stopped; and that he alighted from the engine and watched members of the train crew and others get Zydeck out from under the train.

Charles Carl testified that he was the flagman at the rear end of the train; that he saw 30 or 35 passengers board the train; that he saw the conductor on the station platform after the train stopped and while the passengers were boarding same; that he saw the conductor, while he was on the station platform, give the starting signal to the engineer and the train started; that at that time there were no passengers on the platform; that the train started gradually; that he got on the rear steps of the last car and maintained a lookout as the train proceeded east; that right after the train

started and had moved approximately a car length, somebody came running out on the eastbound platform and "made one grab for the train . . . he lost his balance . . . and went under"; that when he saw this person fall, he immediately felt the emergency brakes being applied by the engineer; that the train was going 3 or 4 miles an hour when the brakes were applied; that from the time it started until it came to a stop it had moved approximately two car lengths; that he did not give a signal to either the conductor or engineer; that he could not tell from what part of the station platform the man came, who made a grab for the train after it started; that the man hurried across the platform at a brisk walk; that he did not know that the man tripped; that he made one grab for the handrail and the motion of the train swung him around; that the train was just starting up when he saw the man reach for the handle; and that he could not say "at which end of which car" the man grabbed for the train.

White, the engineer, and Carl, the flagman, were the only witnesses for defendant who testified that they saw the accident.

Robert S. Tobin testified that he was the conductor in charge of the train; that when it stopped at the station he stood in the open door on the north side of the baggage compartment, which was on the front end of the first car; that from that point he could see the entire station platform; that the only member of the train crew who alighted therefrom at the station platform was the flagman at the rear end of the train; that the train was at the Proviso station about a minute and one-half; that he held the train for a man who was on the viaduct; that this man boarded the rear end of the second car some distance west of the most westerly depot coach; that after this man boarded the train, there was no one else on the station platform; that he then gave the starting signal to the engineer and went

into the first coach to collect tickets; that almost immediately he felt the emergency brakes being applied; that after the emergency stop was made, he went back to where plaintiff was under the train; that the train was started smoothly and without any jerk; that before he gave the starting signal to the engineer, he received a signal from the flagman at the rear of the train; that the Proviso station was used almost exclusively by employees of the railroad; that about 35 passengers boarded the train; that the train was traveling not to exceed 10 miles an hour when the emergency stop was made; that from the time the train started until it stopped after the accident it traveled one and one-half or two car lengths; and that when the train was stopped, plaintiff was lying about a car length east of the east depot coach.

Fred Okey testified that he was an insurance agent and not employed by defendant; that he was on the station platform before the train stopped; that he boarded the train at the rear end of the second car and that he had to walk a few steps west of the west end of the most westerly depot coach to do so; that he stepped inside the car and was just putting his brief case in the rack when the train came to a sudden stop; that when he alighted from the rear end of the second car after the "sudden stop," he was just east of the east depot coach; that the injured man was lying between the station platform and the north rail with his leg under the first truck of the third car; that plaintiff's body was east of the east end of the east depot coach; and that when the train first started, it did so "smoothly."

Raymond Carqueville testified that he was the ticket collector on the second car of the train; that when the train originally stopped at the Proviso station, the rear steps of the second car were some distance west of the west end of the west depot coach; that he did not go out on the station platform until after the emer-

gency stop and that he had not looked out at the platform until that time; that the train had started "slow and easy" without any jerk; that when the emergency brakes were applied, the train came to a sudden stop and he then stepped down to the platform; that the injured man was lying between the platform and the track, about 15 feet east of the east end of the east depot coach; that the train had attained a speed of 4 or 5 miles an hour prior to the emergency stop; that the train moved about two car lengths from the time it started until it stopped; and that he knew that the train traveled two car lengths from the time it started until it stopped, because the engineer told him that it had.

Ben Shapiro testified that he was employed by defendant as a patrolman or special agent; that he boarded the rear end of the first car, which was "just a bit west" of the opening between the two depot coaches; that he went directly into the first car and had just sat down, when the train stopped suddenly; that the train had started smoothly; that he immediately went out on the platform to investigate "what the trouble was"; that the train had moved about two car lengths from the time he boarded it until it stopped; that he assisted in taking plaintiff out from under the train, placing him on a stretcher and putting him in the baggage car; that he assumed charge of Zydeck and accompanied him in the baggage car and to a hospital in Melrose Park; that there was a strong odor of liquor on plaintiff's breath, which he noticed when he helped to get him out from under the train and when he arrived at the hospital; that he told Dr. Joslyn at the hospital that plaintiff had a strong odor of alcohol on his breath; and that Zydeck spoke to him fluently in English when he was taking him to the hospital.

William Edward Nehring testified in part that he was chief clerk at defendant's Proviso freight house;

that he delivered plaintiff's tonnage pay check to him on the day in question; and that he smelled the odor of liquor about plaintiff.

Dr. Arthur E. Joslyn, who operated on plaintiff and thereafter attended and treated him at defendant's instance, testified that when he first examined Zydeck, he smelled the odor of liquor on his breath but that he made no notation to this effect on the hospital record; and that sometime thereafter someone from defendant's claim department discussed with him the question as to whether there was an odor of liquor on plaintiff's breath.

White, the engineer, testified that he and a number of other persons were standing in a group around Zydeck after he had been placed on the stretcher on the station platform and that at that time he smelled liquor but did not know from whom he smelled it.

Tobin, the conductor, testified that when plaintiff was taken out from under the train, he did not notice anything peculiar about his condition or his breath; and that he could smell liquor around there but that "he did not know whether it was from Zydeck's breath or where it was from."

Okey, the insurance agent, testified that he did not notice any "particular smell" of alcohol around the injured man.

Carqueville, the ticket collector on the second car of the train, testified that he was within three or four feet of Zydeck when the latter was lifted out from under the train; that he talked with him; and that he did not notice any odor of liquor on his breath.

Plaintiff testified that he was not intoxicated at the time of the accident and that he did not drink any intoxicating liquor on the day in question prior to the occurrence.

For the purpose of impeaching plaintiff, defendant's attorney read the following questions and answers from a pre-trial deposition of Zydeck, taken Febru-

ary 1, 1946: "Q. Did you get either foot on the step of the car? A. No, I didn't have a chance. Q. What was the cause of the accident? A. What do you mean by that? Q. What made you fall? A. First there was that hole my leg fell into. If I wouldn't fall into that hole I would have no accident. The first time anything like that happened to me in all my life. I worked for a lot of railroads, but I always watched myself. Q. What happened when the train jerked? A. I got hold of the hand hold and then I screamed. Q. And then what? A. I don't remember what happened. I don't remember nothing after that. Q. Did you scream at the time the train jerked? A. Yes, I did. 'Help me. Help me.' Q. Well, were you standing the way I am now standing with both feet up along the side of the platform, is that the way you were standing, like this? A. Yes. Q. With your toes along the edge of the platform and your right hand held on the hand hold, is that right? A. Yes."

For the purpose of impeaching White, the engineer, and Tobin, the conductor, plaintiff presented the testimony of Arthur W. Weeden, a court reporter. Weeden testified from his shorthand notes that he interviewed White on August 8, 1945, at his home and that at that time and place he was asked the following questions and gave the following answers: "Q. Two box cars? A. Two old coaches. You see, the engine was facing the train. That is the reason I saw it. We were backing up. We had started once to back up [to go east] and there was a fellow coming over the bridge and we stopped for him. Q. Waited for him? A. Waited for him. He got on and then we started up."

Weeden also testified that he made shorthand notes of certain questions put to and answered by the conductor on August 18, 1945, and that at that time he was asked the following questions and made the following answers: "Q. So that the train, how far would you say it had travelled? A. Oh, we travelled about a car

length, I would imagine. Q. About a car length. How long a time does it take you to travel a car length? A. Well, that is hard to say. Q. Your best judgment? A. We were just starting out, started and stopped almost immediately as soon as we saw him. Q. That seems to jibe with everybody. Nobody knows anything. A. No, they don't. The bunch had been drinking, of course.''

Lester A. Clark, a court reporter, testified that he took down in shorthand a statement made by defendant's witness, Okey, on April 15, 1946, in which he was asked the following question and made the following answer: ''Q. How far would you say the train travelled from the time it started until it stopped? A. Oh, I don't know, possibly a car length, I imagine it was.''

Defendant first contends that ''the verdict and judgment are against the manifest weight of the evidence.''

Inasmuch as we have set forth the evidence in considerable detail, we deem it unnecessary to discuss it at length. We will, however, briefly refer to certain portions thereof.

It is uncontroverted on this appeal that plaintiff made out a prima facie case that he was free from contributory negligence and that defendant was guilty of negligence as charged in the complaint.

As has been seen, defendant attempted to show that plaintiff was under the influence of intoxicating liquor, at least to some extent, at the time of the accident. In view of the evidence heretofore set forth on this subject, we think that the jury was warranted in finding that Zydeck drank no intoxicating liquor on the day of the accident.

Plaintiff's version of the accident, as he related it to the jury, was that when he came out on the station platform through the opening between the two depot coaches, the train was standing still with the rear steps of the second car opposite said opening; that while the train remained stationary, he took hold of the hand

rail with his right hand and put his right foot on the step at the rear end of the second car; and that while he was in that position, the train suddenly started with a jerk, causing his left foot to go into the hole; and that he was thereby thrown off balance and under the train.

While it is true that the engineer said that Zydeck "lunged" out through the passageway between the two depot coaches and attempted to board the train when it was moving at a speed of about 4 or 5 miles an hour, he corroborated plaintiff to some extent as to the position of his body as he attempted to board the train, when he testified in effect that Zydeck had one hand on the hand rail and one foot on the step and that when he raised the other foot, he tripped, lost his balance and went under the train.

As already shown, defendant's only other witness who testified that he saw the accident was Carl, the flagman. Although the conductor said that he did not get off the train while it was stopped at the station and that he received the "go ahead" signal from the flagman, before he gave the starting signal to the engineer, Carl testified that he saw the conductor on the station platform but that the conductor was given no signal by him. He also testified that there were no passengers on the station platform when the conductor gave the starting signal to the engineer. Yet he maintained a lookout along the platform as the train proceeded east, although there was no necessity for doing so. He had nothing to do with the operation of the train, except to protect the rear end thereof from "oncoming trains." When it is considered that the flagman, standing on the rear steps of the last car, and the engineer, in the cab of the locomotive, were about equally distant from the rear entrance of the second car, it is impossible to reconcile their testimony as to how the accident happened. Although Carl stated that he was maintaining a lookout to the east along the sta-

tion platform and had a clear view of at least nine feet thereof south of the depot coaches, he did not see from which part of the station platform "the man" came or "at which end of which car he grabbed for the train." The essence of his testimony is that the man made a wild grab for a handrail somewhere along the north side of the moving train and was thrown under it. It is unreasonable to believe that Zydeck, an experienced railroad man, would attempt to board the train in the manner described by the flagman and his testimony in this regard was so improbable that the jury had the right to reject it.

There is no question but that plaintiff attempted to board the train at the rear end of the second car, when said rear end was opposite the passageway between the two depot coaches.

No witness other than the engineer testified directly that the train was moving when the rear entrance of the second car was opposite the passageway between the two depot coaches but defendant sought to corroborate the engineer's testimony in this regard by the testimony of the conductor, flagman, special agent, ticket collector and insurance agent. These five witnesses testified in effect that the rear entrance of the second car was some distance west of the west end of the west depot coach when the train was originally stopped at the station; that from the time the train started until it was stopped after the accident, it had traveled approximately two car lengths; and that when the emergency stop was made, the rear end of the second car was some distance east of the east end of the east depot coach. If this testimony of these five witnesses were true, then the train must have been moving when the rear end of the second car was opposite the opening between the two depot coaches. However, the testimony of the ticket collector as to the distance the train traveled after it was originally stopped was discredited by his own testimony on cross-examination, when he stated that he did

not know how far the train had traveled but that the engineer told him that it had traveled two car lengths from the time it started until it stopped. The jury might reasonably have considered that the engineer was attempting to fortify his own testimony when he made the foregoing statement to the ticket collector. It is also fair to assume that the ticket collector received the suggestion from some source that when the train originally stopped, the rear end of the second car was some considerable distance west of the west end of the west depot coach, because later in his examination he stated that he had not even looked out from the train at the station platform until after the emergency stop was made.

It will be recalled that the conductor made a statement a short time after the accident in which he said that the train traveled about a car length from the time it started until it stopped and that "we were just starting out, started and stopped almost immediately as soon as he saw him." It was also shown that the insurance agent made a statement a short time after the accident in which he said that from the time the train started until it stopped it traveled "possibly a car length." It is reasonably apparent that if the train only traveled about one car length from the time it started until it was stopped by the application of the emergency brakes and that if the rear end of the second car was about a car length east of the opening between the two depot coaches when the emergency stop was made, then the train must have been originally stopped with the rear entrance of the second car about opposite said opening.

The record discloses that the hole in question was so situated and of such a nature that, even though it was partially filled with some of the fine crushed stone from the station platform, it may well have caused plaintiff to trip and lose his balance, as his left foot went into it, as he testified.

The jurors saw and heard the witnesses and were afforded an opportunity of observing their appearance, fairness, candor and demeanor and of determining their credibility and the weight of their testimony. The trial court approved the verdict and we do not think that we would be justified in disturbing it.

Defendant next contends that the trail court erred in giving to the jury the following instruction, tendered by plaintiff:

"If the jury finds from the greater weight of the evidence that the defendant stopped its train at the Proviso railroad station at the usual stopping place for taking on passengers and that while said train was so stopped the plaintiff, with ordinary care and caution for his own safety, took hold of the handrail with the purpose and intention of boarding said train and becoming a passenger thereon, and raised one foot towards or onto the step of the train of said car and while in such position the defendant railroad negligently started the car before the plaintiff had a reasonable time to get aboard, and that in consequence of such starting the plaintiff was injured, your verdict should be for the plaintiff."

Defendant insists that, since this was a peremptory instruction and it disregarded the affirmative defence that the pass plaintiff intended to use for his transportation on the train was issued to him as a mere gratuity, it was reversible error to give it to the jury. The undisputed evidence shows that the pass was not given to plaintiff as a gratuity but as part of the consideration for his services and that, even though he did not work on the day in question, it was permissible for him to use the pass on that day as an incident of his employment. It will be remembered that plaintiff testified that on the first day he was employed at defendant's freight house the man, who hired him, told him that he would receive seventy-five cents an hour and a pass and it will also be recalled that defendant's

chief clerk testified that it was permissible for transient employes to go to the freight house on days they did not work to get their tonnage pay checks. Therefore, there was no disputed question of fact to be submitted to the jury in reference to the pass being a gratuity or to its permissible use on the train as an incident of plaintiff's employment. In *Klinck v. Chicago City Ry. Co.,* 262 Ill. 280, in discussing a release on the reverse side of a pass, similar to that in this case, the court said at p. 296: "The ticket on which Klinck was intending to ride having been given to him, under his contract of employment, as part of the consideration for his services, he was a passenger for hire, and the stipulation on the back of the ticket releasing plaintiff in error from liability for personal injuries was therefore void."

Defendant also criticises the foregoing instruction in several other respects, but, since we think that this further criticism is hypercritical, it would serve no useful purpose to discuss same.

Defendant next contends that the trial court erred in giving the following instruction at plaintiff's instance:

"The court instructs the jury that it is not necessary in order to create the relationship of carrier and passenger, that the passenger should have entered the train, but if he is at the place provided for passage, such as the platform at the station, with the intention of taking passage and that the defendant railroad, through its train crew or any employee thereof, gave their assent either expressly or impliedly by words or conduct, he is entitled to all the rights and privileges of a passenger."

Defendant's only criticism of this instruction that need be considered is that it was "misleading because it intimates that the defendant was required to use the usual high degree of care imposed upon carriers when passengers are lawfully aboard trains, namely, the

duty to use the highest degree of care commensurate
with the practical operation of the railroad and the
mode of conveyance adopted.'' It is difficult to con-
ceive how this instruction could possibly have conveyed
such an intimation to the jury. It should not have
been given because it is inapplicable to the factual
situation presented by the evidence. However, the
harm, if any, in this instruction was negligible and was
cured by other instructions that were given to the jury
that defendant was only required to exercise reason-
able care in the operation of its train and to use rea-
sonable care to maintain its station platform in a
reasonably safe condition.

It is also contended that the trial court erred
in giving the following instruction at plaintiff's in-
stance:

''The jury are instructed that in considering the
credibility of witnesses and in determining the weight
to be given their testimony they can take into consid-
eration the fact that a witness is in the employ of de-
fendant railway company, and also his connection, if
any, with the accident causing the injuries complained
of, taking the same in connection with all the other
facts and circumstances in evidence.''

While this instruction was inaptly phrased and not
properly qualified, we do not think that it was prejudi-
cial when considered in conjunction with the following
instruction, which was given at defendant's request:

''The court instructs the jury that while they are
the judges of the credibility of the witnesses, they have
no right to disregard the testimony of an unimpeached
witness sworn on behalf of defendant simply because
such witness was or is an employee of the defendant.
It is the duty of the jury to receive the testimony of
such witness in the light of all the evidence, the same
as they would receive the testimony of any other wit-
ness and to determine the credibility of such employee

by the same principles and tests by which they would determine the credibility of any other witness.''

■ It is further contended that the trial court erred in refusing to give defendant's instruction 14, which is as follows:

''The court instructs the jury that plaintiff is required to prove his case by a preponderance of the evidence before he can recover. If the plaintiff in this suit has not so proved his case or if the evidence is evenly balanced so that the jury are in doubt and unable to say on which side is the preponderance of the evidence, or if the preponderance of the evidence is in favor of the defendant, then in either of these cases the verdict should be not guilty.''

While this instruction might have been properly given, in our opinion, the refusal to give it did not constitute reversible error, in view of the fact that several other instructions were given to the jury as to the degree of proof required of plaintiff in order to entitle him to recover, including instruction No. 5 tendered by defendant, which is as follows:

''The plaintiff cannot recover in this case against defendant unless the jury believe that the plaintiff has proved by a preponderance of the evidence each of the following propositions:

''1. That the alleged injuries of which plaintiff complains were not brought about or proximately contributed to by any failure on his part to exercise ordinary care for his own safety at and just prior to the time of the accident in question.

''2. That the defendant was guilty of one or more of the acts of negligence in the manner charged in the complaint.

''3. That such negligence, if any, was the proximate cause of the plaintiff's alleged injuries.

''If the jury find from the evidence that the plaintiff has failed to prove by a preponderance of the evidence

these propositions as stated, or that he has failed so to prove any one of them, he cannot recover against defendant.''

Other instructions advised the jury that the preponderance of the evidence meant the greater weight of the evidence. Defendant's instruction No. 5 told the jury specifically that plaintiff had the burden of proving every essential element of his cause of action by the greater weight of the evidence before he could recover and it therefore excluded the possibility of plaintiff's right to recover if the evidence left ''the jury in doubt and unable to say on which side is the preponderance of the evidence, or if the preponderance of the evidence is in favor of the defendant.'' Defendant's refused instruction 14 and its given instruction 5 both covered the degree of proof required of plaintiff and they were substantially the same in effect. In *Central Illinois Public Service Co. v. Deterding,* 331 Ill. 277, the court said at p. 286: ''It is not necessary or proper to encumber the record with instructions covering the same matters, differing only in verbiage. Such practice tends rather to confuse than to enlighten the jury.''

It is finally contended that the trial court erred in refusing to give defendant's instruction 15, which is as follows:

''As to the charge in plaintiff's complaint that defendant negligently maintained said station platform, you are instructed that there was no duty upon defendant to maintain said platform free from all inequalities and from every possible obstruction to travel. If you find from the evidence that the alleged defect, if any, was a minor one and that defendant could not have reasonably anticipated that a person in the exercise of ordinary care for his own safety would have tripped on said plank on account of said alleged defect, then you should find defendant not guilty on said charge of negligently maintaining said platform.''

Another instruction was given at defendant's instance which correctly stated the degree of care required of defendant in the maintenance of its station platform. Instruction 15 was properly refused because it is largely argumentative.

For the reasons stated herein the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.